MARIE B. MORIN *vs.* MASSACHUSETTS BLUE CROSS, INC.
& others.

Worcester.    March 6, 1974. — June 6, 1974.

Present: REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Subrogation.    Insurance,* Subrogation, Construction of policy, Health insurance.    *Words,* "Health insurance."

A medical insurance policy, which entitled the insurer to be subrogated to any right of the insured "against any person or organization, except insurers on policies of health insurance covering the . . . [insured]," did not entitle the insurer to payments due the insured from another

insurer for medical expenses arising from an automobile accident under a policy held by the owner of the automobile. [383-391]

BILL IN EQUITY filed in the Superior Court on September 10, 1971.

The suit was heard by *Meagher*, J.

*Gerald E. Shugrue* for the plaintiff.

*Jeffrey Swope* for the defendants.

*Robert H. Quinn*, Attorney General, *James P. Kiernan*, Assistant Attorney General, *& John G. Ryan*, for the Commissioner of Insurance, amicus curiae, submitted a brief.

KAPLAN, J. 1. *The case*. The plaintiff Marie B. Morin was injured on November 7, 1970, while riding as a passenger in a car owned and operated by Michael J. Reidy. As the plaintiff was a subscriber to a group coverage "Master Medical Certificate" of the defendants Massachusetts Blue Cross, Inc., and Massachusetts Blue Shield, Inc., hospitalization charges of $3,236.05 and doctors' fees of $294 incurred by her in consequence of the injuries were paid by Blue Cross-Blue Shield pursuant to and within the limits of the terms of the certificate.

At the time of the accident, Reidy held a "Massachusetts Combination Motor Vehicle Policy" sold to him by the defendant Fireman's Fund American Insurance Companies. Reidy had elected optional coverage D — "Automobile Medical Payments" — which in "Division 2" obligated the insurer, without regard to fault, to pay all reasonable expenses incurred within one year of the accident for necessary medical and other like services to any person who sustained injury, sickness, or disease caused by accident while in the insured vehicle, if it was being used by the named insured (Reidy) or with his permission. Of the "limits" of $500-$5,000 offered for medical payments coverage, Reidy had elected the "$2,000 each person" limit.

The plaintiff made demand on Fireman's for $2,000. But Blue Cross-Blue Shield notified Fireman's that they claimed this sum on the basis of the "subrogation" provi-

sion of the master medical certificate, to be discussed later in this opinion.

The expenses for which payment was made by Blue Cross-Blue Shield were incurred within one year of the accident and were, to the full limit of $2,000, of the kind falling under the terms of coverage D, division 2. Fireman's was thus in the position of a stakeholder faced with conflicting claims. Therefore it drew its check for $2,000 payable jointly to the plaintiff and Blue Cross-Blue Shield, and has remained indifferent.

In the present suit, the plaintiff sought a determination of the rights of the parties with appropriate consequential relief. On a case stated setting out the foregoing facts, a judge of the Superior Court, holding that the subrogation provision applied, entered a final decree directing the plaintiff to indorse Fireman's check to the order of Blue Cross-Blue Shield.[1]

The plaintiff appeals. As the appeal raises an important practical question within the field of administration of the Commonwealth's Division of Insurance, the court, without objection by the parties, invited the Commissioner of Insurance to assist it as an amicus. The Commissioner accepted the invitation and has prepared a brief and submitted it through the office of the Attorney General, and Blue Cross-Blue Shield have replied.

2. *The contracts.* The master medical certificate expresses in its "definitions" and statement of "benefits," "benefit limitations," "benefit conditions," and "extent of and duration of benefits," a variety of medical services and supplies, and limitations upon them, that Blue Cross-Blue Shield undertake to provide to members in case of injury or illness. Later in the contract appears the subrogation provision:

"VII. SUBROGATION To the extent that benefits for services, supplies, or both are provided hereunder, Blue

---

[1] The decree states further that it is without prejudice to the assertion by Blue Cross-Blue Shield of a right of subrogation, to the extent of the benefits provided by them, to any further right of recovery of, or amount recovered by, the plaintiff.

Cross, and Blue Shield shall be subrogated and succeed to any right of recovery of the Member or Subscriber because of such services or supplies against any person or organization, except insurers on policies of health insurance covering the Member or Subscriber. The Member and the Subscriber shall pay over to Blue Cross and Blue Shield all amounts recovered by suit, settlement, or otherwise from any third person or his insurer to the extent of the benefits provided hereunder. The Subscriber and Member shall take such action, furnish such information and assistance, and execute such instruments as Blue Cross and Blue Shield may require to facilitate enforcement of their rights hereunder, and shall take no action prejudicing the rights and interests of Blue Cross and Blue Shield hereunder."

Fireman's Massachusetts combination motor vehicle policy sets out in one instrument a number of coverages: the "compulsory" coverage for bodily injury liability (statutory) and "mandatory" coverage U for damages for bodily injury caused by uninsured automobiles, and "optional" coverages as follows: B for bodily injury liability (nonstatutory); C for property damage liability; D for automobile medical payments; E for "comprehensive" physical damage coverage (excluding collision); F for collision; G for fire, lightning, and transportation; H for theft (broad form); I for windstorm, hail, earthquake, or explosion; J for combined additional coverage; and K for towing and labor costs. Coverage D provides:

"Coverage D — Automobile Medical Payments — (This Coverage is Optional). The company will pay all reasonable expenses incurred within one year from the date of accident for necessary medical, surgical, X-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services:

"Division 1. To or for each insured who sustains bodily injury, sickness or disease, including death resulting therefrom, caused by accident, (a) while in or upon, or while entering into or alighting from a motor vehicle, provided that with respect to a motor vehicle not owned by or furnished for the regular use of any insured under division

1, this insurance shall apply only if the insured has, or reasonably believes he has, the permission of the owner to use the motor vehicle and the use is within the scope of such permission, or (b) through being struck by a motor vehicle;

"Division 2. To or for any other person who sustains bodily injury, sickness or disease, including death resulting therefrom, caused by accident, while in or upon, or while entering into or alighting from the motor vehicle, provided the motor vehicle is being used by the named insured or his spouse if a resident of the same household, or with the permission of either."

The combination policy contains a "subrogation" provision, but coverage D is expressly excepted from it.

3. *Interpretation.* Blue Cross-Blue Shield (appellees) do not press any contention that they are entitled to subrogation as a matter of general law without regard to the presence of a subrogation provision in their certificate. Such a contention would no doubt invite an inquiry as to whether the duty of the appellees to pay medical expenses of members is one of "indemnity," and an argument that if it is not, there can be no implicit right of subrogation. The question of the strength of that line of analysis we leave to another day. Cf. *General Exch. Ins. Corp.* v. *Driscoll*, 315 Mass. 360, 364 (1944); *Travelers Ins. Co.* v. *Graye*, 358 Mass. 238, 240 (1970); Kimball and Davis, The Extension of Insurance Subrogation, 60 Mich. L. Rev. 841 (1962). But rights of, or akin to, subrogation not available under general law may be reserved by agreement (and, we suppose, agreement may limit subrogation otherwise available under general law). Compare *Michigan Hosp. Serv.* v. *Sharpe*, 339 Mich. 357 (1954), with *Michigan Medical Serv.* v. *Sharpe*, 339 Mich. 574 (1954). See *Hospital Serv. Corp.* v. *Pennsylvania Ins. Co.* 101 R. I. 708, 717 (1967). The problem in the present case reduces to the meaning or scope of the subrogation provision as it bears on the facts of the case; the appellees advance no other theory of suit.[2]

[2] The United States, having furnished free medical services as required by law to military people or their dependents who were insureds under medical payments

On this question of interpretation, the parties are at odds. The Commissioner of Insurance independently concludes that subrogation does not extend to the plaintiff's (appellant's) right of recovery of medical payments through Fireman's policy.[3] We reach the same conclusion on the alternative grounds that the "except" clause of the subrogation provision is reasonably indicative in excluding that right of recovery, or that the clause is unclear or ambiguous on the point and so ordinary canons apply favoring the insured over her insurer in the reading of the insurance contract (the appellees being treated as insurers for the purpose, see *MacArthur* v. *Massachusetts Hosp. Serv. Inc.* 343 Mass. 670, 672 [1962]).

Fixing on the first sentence of the subrogation provision, the appellees say that the appellant has the requisite "right of recovery" against Fireman's under coverage D of Fireman's policy, and upon that right the subrogation provision of the Blue Cross-Blue Shield contract operates; the "except" clause at the end of the sentence, they say, does not prevent that result because Fireman's policy is not one of "health insurance." The appellees suggest that whether Fireman's policy is a health insurance policy within the subrogation provision is to be decided by characterizing the policy as a whole, and they then directed us to G. L. c. 175, § 47, Sixth, with an invitation to choose whether the policy, as such, is one "[t]o insure . . . (b) any person against legal liability for loss on account of the injury or death of any

provisions, has succeeded in some actions against the insurers in claiming as "third-party beneficiary" under policy clauses which permitted the insurer to pay direct to those furnishing the services to the insured. (Such a clause appears in Fireman's policy.) These cases, however, do not involve any competing claims by the insureds. See, e.g., *United States* v. *United Servs. Auto. Assn.* 431 F. 2d 735 (5th Cir. 1970), cert. den. 400 U. S. 992 (1971).

On its own part, Fireman's has not resisted payment on the theory that expenses were not "incurred" within coverage D because the appellees paid them — a theory which has failed in such cases as *Kopp* v. *Home Mut. Ins. Co.* 6 Wis. 2d 53 (1959).

[3] The appellees' nongroup certificates are subject to prior approval, and their group certificates to subsequent disapproval, of the Commissioner of Insurance. G. L. c. 176A, § § 6, 10, c. 176B, § 4. The present subrogation provision appears in the appellees' certificates of both types.

other person" and so forth, or is rather a policy "(d) to make insurance upon the health of individuals."[4] They express confidence that, as between the two, we would choose the former category. There is argument, however, that the proffered choice is not an apposite one. Fireman's policy is actually related to c. 175, § 113C, which states in effect that motor vehicle liability policies (as defined By G. L. c. 90, § 34A) shall not be issued unless they offer certain additional coverages as options, including "medical coverage, so-called . . . to a limit of at least five thousand dollars."[5] Reading Fireman's policy in the light of § 113C, one can fairly describe it as in truth, as its title indicates, a "combination" of insurance policies, one of which relates to medical payments. The Commissioner suggests that thus to treat the policy as a looseknit combination is consistent with the trend toward multiple line underwriting and "packaging" of insurance.

But if the medical payments coverage in Fireman's policy is to be looked at separately, the appellees would contend that it is not "health insurance" but rather accident insurance (referring to § 47, Sixth,—"To insure, [a] any person against bodily injury or death by accident"). We do not have the benefit of statutory definitions of the critical terms that might be of some assistance in the interpretation of the subrogation provision. It is pointed out that medical payments clauses have been called accident insurance. See, e.g., *Johnson* v. *New Jersey Manufac-*

---

[4] Section 47 states the "purposes" for which companies may be incorporated under the insurance law.

Nothing said in this opinion should be taken as an interpretation of § 47 on the question whether given insurance business falls under particular stated "purposes." The question at bar is an interpretation of a contract provision; as we point out in the text below, the terms of this and other statutes are interesting only analogically.

[5] Besides § 113C, see § 113L (mandatory uninsured motor vehicle coverage). See also § 111C stating, in part, that a policy of insurance issued under § 47, Sixth (b) (the legal liability category, mentioned earlier in our text), may also insure in respect to medical expenses of any person, including the named insured under the policy. Section 111C states that § 108, containing detailed regulations of "policies of accident and sickness insurance," shall not apply to the liability policies with the added coverage.

*turers Indem. Ins. Co.* 69 N. J. Super. 184, 190 (App. Div. 1961); *Foundation Reserve Ins. Co. Inc.* v. *Cody*, 458 S. W. 2d 214, 217 (Tex. Civ. App. 1970). But the contexts of those characterizations were quite different from the present. In our decision of *Kerrigan* v. *Boston*, 361 Mass. 24, 29 (1972), we said (in the course of a discussion of the phrase "other health insurance" as it appears in a special statute):[6] "Insurance providing weekly sickness benefits is undoubtedly 'insurance upon the health of individuals' under G. L. c. 175, § 47, Sixth (d). Weekly accident benefits during a hospital stay may conceivably fall in the same category, although they are more naturally treated as insurance 'against bodily injury . . . by accident' under G. L. c. 175, § 47, Sixth (a). See *Mutual Benefit Health & Acc. Assn.* v. *United Cas. Co.* 142 F. 2d 390, 394 (1st Cir. [1944]), cert. den. 323 U. S 729 [1944]." The medical payments provision at bar may be thought a stronger case for characterization as health insurance than the weekly accident benefits of the *Kerrigan* case. The obligation, to be sure, arises upon "accident" connected with the insured car. But the medical payments are not a compensation for lost wages as were the benefits in the *Kerrigan* case; they correspond to the medical expenses themselves, whether occasioned by the injury or related "sickness" or "disease." The appellees' own certificate is surely regarded as a "health" contract, yet its coverage is not confined to ordinary sickness but extends to injury which may be caused by accident. Judge Magruder in the *Mutual Benefit* case, cited in the *Kerrigan* opinion, was prepared to read the health insurance clause of § 47, Sixth (d), as "broad enough to authorize the Company to contract to indemnify an insured for expenses on account of any bodily condition necessitating hospital or

---

[6] The trustees of the Boston Teachers Union Health and Welfare Fund were authorized by the fund agreement to provide for weekly accident and sickness benefits and the trustees adopted an insurance program that included such benefits of $150 a week for as long as fifty-one weeks for each hospital stay. If this was "other health insurance" within G. L. c. 32B, § 15, the requirements of the statute would not have been satisfied, and the program would fail. In fact the court found that the quoted phrase had a very specialized meaning determined by its history.

medical care" (142 F. 2d at 394),[7] but again, as Judge Magruder himself recognized, we may not use such a formula as a pass key to disparate problems.[8] On the whole, the mildest conclusion warranted is that the relation of "accident" to "health" is very intimate in point both of fact and law.[9]

We have dealt with statutes, but these have only an indirect bearing because it is a contract provision we are interpreting, and meaning is to be extracted in the usual commonsense ways. The words "medical payments" readily call up the idea of "health." An intelligent reader looking at the subrogation provision and asked whether he thought it applied to medical payments in the combination policy could be expected to wonder why the reason behind the exception for health insurance (whatever exactly that might mean) would not embrace the medical payments coverage as well. The appellees say that "most" health insurers place subrogation provisions in their policies and, as this might create administrative complications if the appellees' certificates carried overlapping subrogation provisions, the draftsman of the appellees' certificate excepted this health insurance. No doubt the use of subrogation provisions in health policies has been on the rise (though the precise frequency would be hard to establish, and a count would not be very revealing without information about the types of clauses employed). But we learn that

---

[7] The Commissioner of Insurance in his brief offers as a formula to answer the question what is health insurance for the purpose of the present case: "[I]nsurance coverages that pay defined persons for the costs, or a part thereof, that such persons incur as a result of sickness or injury regardless of cause and without regard to the liability of another person for such sickness or injury."

[8] The question was whether an arbitrator under a takeover agreement between two insurance companies should have excluded pregnancy from "sickness" as the term was used in the agreement.

[9] The mélange is illustrated by G. L. c. 175, § 110C, which authorizes two or more companies entitled to do the health insurance business described in § 47, Sixth (d), in specified events to act jointly to insure certain persons against financial loss due to "accident or sickness." Symptomatically, Appleman speaks of medical payments provisions of automobile liability policies as akin to accident policies, but two pages later he says the expense payments are in the nature of health insurance. Appleman, Insurance Law and Practice, § 4896, pp. 349, 351 (1962).

automobile liability policies with medical payments provisions have also increasingly carried subrogation provisions applicable to those payments.[10] Thus the reason suggested by the appellees why the health exception would stop short of medical payments is less than wholly convincing. (Incidentally, as to administration, the technical overlap of subrogation provisions need not necessarily hamstring the practical supply of benefits.)

To the contrary, a reason can be offered why the draftsman would not want to stop short of medical payments, and could well intend the health insurance exception to apply in the broader (and perhaps more colloquial) sense. The draftsman can be charged with knowledge that the benefits of the appellees' medical service plan are limited and must often fall short of meeting the need when injury or sickness strikes. Therefore it made sense to leave the subscriber free, if he chose, to buy additional insurance. At any rate any "double" recovery involved was not such an anomaly as to put in question the intention to give the health insurance exception a reasonably wide scope.[11] It might have occurred to the draftsman to deny subrogation with respect to insurance bought by a subscriber to the medical service plan, and to allow it where the subscriber was covered by insurance purchased by someone else, but such a distinction might be thought too fine.

The appellees go on to argue that if the present situation was indeed excepted from the first sentence of the subrogation provision, it nevertheless fell under the second sen-

---

[10] The increased employment of subrogation clauses in both categories has been noted, although without precise quantification. See Kimball and Davis, The Extension of Insurance Subrogation, 60 Mich. L. Rev. 841, 843 (1962); Keeton, Insurance Law, 149-150 (1971); Capwell and Greenwald, Legal and Practical Problems Arising from Subrogaton Clauses in Health and Accident Policies, 54 Marquette L. Rev. 255, 256-257 (1971). See n. 11 below.

[11] In reading cases involving medical service organizations we have come upon certificates with subrogation clauses that expressly exempt from subrogation rights of recovery on all policies of insurance issued to subscribers, e.g., *Collins* v. *Blue Cross*, 213 Va. 540, 541-542 (1973). Another subrogation clause seems directed only to causes of action of subscribers against tortfeasors, *Associated Hosp. Serv. Inc.* v. *Milwaukee Auto. Mut. Ins. Co.* 33 Wis. 2d 170, 171 (1967). For another variant "exclusion," see *Smith* v. *Idaho Hosp. Serv. Inc.* 89 Idaho 499, 501 (1965).

tence when the appellant "recovered" $2,000 from Fireman's as joint payee of the check. The appellant may reply that there is an incongruity in reading the second sentence in such a way as to wipe out an exception in the first. Moreover, the recovery spoken of is by the member "from any third person or his insurer." On the surface this looks to the typical case of a recovery from a third-person tortfeasor or his insurer (which is also the typical case under the first sentence). But Fireman's obligation to the appellant is direct, as the language of division 2 of the medical payments coverage itself indicates, and the appellant has direct legal recourse against Fireman's. See *Foundation Reserve Ins. Co. Inc.* v. *Cody,* 458 S. W. 2d at 217; cf. G. L. c. 175, § 111. The only "third person" in the picture is Reidy, the named insured, but the plaintiff is not in a position to recover anything from Reidy (unless by chance Reidy was responsible as a tortfeasor for the plaintiff's injury, which is not suggested). Any argument drawn from the second sentence is further weakened if we consider a hypothetical case in which Reidy himself is a member of the appellees' plan, is injured in the car accident, and brings a suit otherwise identical with the present: who now can be called the "third person"? Yet the appellant's case should rise no higher than Reidy's in the hypothetical.[12]

4. *Conclusion.* Upon assessment of the arguments and considerations on both sides, set forth above, we conclude that the subrogation claim of the appellees should be denied. Taking the appellant's case at its lowest, those

---

[12] A likely reason for the insertion of the second sentence was to try to avoid those cases (now in a minority) holding invalid and inoperative a subrogation clause by which a service organization like Blue Cross or an insurer under a medical payments clause was to be subrogated to the subscriber's or insured's cause of action for personal injuries against the tortfeasor. See annotations, 43 A. L. R. 2d 1177 (1955); 19 A. L. R. 3d 1054 (1968). The invalidity was thought to follow from the nonassignability of such claims. A clause providing not for subrogation to the cause of action, but succession to the receipts, might be treated differently. See Keeton, *supra,* n. 10, at p. 150, and n. 16; *Higgins* v. *Allied Am. Mut. Fire Ins. Co.* 237 Atl. 2d 471, 472 (D. C. C. A. 1968). The entire problem of validity is discussed in Capwell and Greenwald, *supra,* n. 10. See also *Silinsky* v. *State-Wide Ins. Co.* 30 App. Div. 2d (N. Y.) 1 (1968).

guides to interpretation are invoked which hold that "Ambiguities in the policy are to be construed against the insurer"; that "Exclusions from coverage are to be strictly construed"; and that "Where the language permits more than one rational interpretation, that most favorable to the insured is to be taken." *Palmer* v. *Pawtucket Mut. Ins. Co.* 352 Mass. 304, 306 (1967).[13] Here we should note that while the appellees are able to assemble a number of cases in which medical service organizations, under subrogation provisions of their contracts, have succeeded in pursuing the claims of their members against third-person tortfeasors (or insurers of those tortfeasors)[14] — and we need not raise any question about that route being open to the appellees here — no such authority is cited for use of the subrogation provisions to secure recovery against insurers of the members themselves. Informed opinion raises a serious question about such a recovery even where the subrogation provision is nominally clear enough to encompass it.[15] It would be a hard thing in the name of subrogation to take away the benefits of insurance that have been paid for (here, as it happens, not by the plaintiff herself, but by Reidy), with the further curiosity that the more that was paid, the more would be taken away: suppose the medical payments coverage had been purchased up to a limit of $5,000 instead of $2,000. To offset the taking would be a hope that it might result in a possible fractional lowering of rates for all subscribers to the appellees' plans, but that

---

[13] These canons are drawn into an organic view of the insurance field in Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv. L. Rev. 961, 1281 (1970).

[14] See n. 12 above.

[15] Thus Capwell and Greenwald, *supra* n. 10, 54 Marquette L. Rev. at 276 (1971): "Whether or not a subrogated insurer or health plan would be entitled to recover from another carrier or plan providing similar benefits on behalf of the insured, solely on the basis of the subrogation provisions, has not been decided by any case uncovered in the research for this article. It would appear to this writer that such an attempt would be novel and unsuccessful. In order for the court to recognize such a right, it would have to hold that one party providing first party insurance benefits would be able to recover from another party who stands in the same shoes, without any reasonable distinction present to justify the apparent arbitrary result."

that element has figured in the calculation of present rates must be thought dubious, when the Commissioner himself thinks the taking improper under the subrogation provision as now written.

On the side of the appellees we are urged to assist in holding down the costs of their nonprofit services in the long run by discouraging duplicating coverages and recoveries and by permitting broad subrogation on their behalf. The indicated goals may be in the public interest, but we may not overreach a proper interpretation of the contract in order to advance them. One of the forums for debate and decision of such critical questions is the administrative agency which has access to the entire field with its complicated interrelationships[16] and is empowered to investigate the effects of contract terms and to regulate and improve them.

In the view that we have taken, it becomes unnecessary to deal with further legal issues that would arise if we were to find that the subrogation provision on a proper reading did purport to extend to the appellant's rights under Fireman's contract.[17]

*Decree reversed.*

---

[16] The turbulence in the field of priorities among insurers, as well as the ongoing efforts to rationalize these priorities, are illustrated by *American Family Life Assur. Co.* v. *Blue Cross of Fla. Inc.* 346 F. Supp. 267 (S. D. Fla. 1972), affd. 486 F. 2d 255 (5th Cir. 1973), cert. den. 416 U. S. 905 (1974) (evolution of a "coördination of benefits" arrangement). There are many pieces to be fitted together — the Commissioner of Insurance expresses concern, for example, about the relation of the subrogation attempted here to "no fault" insurance coverage — and it seems clear that to avoid wars of subrogation clauses, exclusion clauses, and conditions, coördinated solutions of wide compass are required.

[17] We would then face a question of validity, n. 12 above, but this would not appear to be serious. As n. 12 indicates, the weight of authority supports the validity of subrogation attaching even to a subscriber's cause of action for personal injuries.